ACCEPTED
03-14-00774-CV
7701600
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/5/2015 1:37:42 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00774-CV

_____

### IN THE THIRD COURT OF APPEALS
### AT AUSTIN, TEXAS

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/5/2015 1:37:42 PM
JEFFREY D. KYLE
Clerk

_____

### TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS,
### and NICOLE ORIA, in her Official Capacity as Executive Director
*Appellants/Cross-Appellees*,

**v.**

### ELLEN JEFFERSON, D.V.M.,
*Appellee/Cross-Appellant*.

_____

### On Appeal from the 127th Judicial District Court of Travis County, Texas
### Cause No. D-1-GN-14-000287
### The Honorable Gisela D. Triana presiding

_____

### APPELLANTS'/CROSS-APPELLEES'
### SUGGESTION OF MOOTNESS

_____

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

Appellants/Cross-Appellees, the Texas State Board of Veterinary Medical Examiners and Nicole Oria, in Her Official Capacity as Executive Director (hereinafter collectively referred to as the "Board"), by and through the Office of the Attorney General of Texas and the undersigned Assistant Attorney General, submit this suggestion of mootness regarding the pending cross-appeal filed by Appellee/Cross-Appellant Ellen Jefferson, D.V.M. ("Dr. Jefferson").

1. After the Board appealed the district court's judgment invalidating two Board rules, Dr. Jefferson filed a cross-appeal challenging the same judgment which dismissed her claims under the Uniform Declaratory Judgments Act. CR 855-57; 871-72. Dr. Jefferson challenged the Board's jurisdiction with respect to a complaint regarding the treatment of a German Shepherd dog which was fostered out of San Antonio Pets Alive! ("SAPA"), an animal shelter. In addition to allegations regarding the treatment of the dog, the Board further alleged that Dr. Jefferson mishandled medication and failed to respond to Board's Staff's request to furnish certain information. Dr. Jefferson claims that she is exempt from the care and treatment of the dog pursuant to an exemption in the Veterinary Licensing Act ("Act"). Tex. Occ. Code § 801.004(1).

2. Since the district court's judgment was entered, Dr. Jefferson and Board Staff tried the exemption issue at the State Office of Administrative Hearings ("SOAH"). Exhibit A. The SOAH Administrative Law Judge ("ALJ") made a preliminary determination that Dr. Jefferson is exempt from the Act, and referred the other two issues (mis-handling of drugs and failure to provide information) for a later hearing. *Id.* at 16. The ALJ then referred the matter to mediation. Exhibit B.

3. In light of the events which occurred in the underlying administrative proceeding since the filing of Dr. Jefferson's cross-appeal, and after careful consideration, Board Staff decided to dismiss the SOAH complaint and close the

remaining administrative cases.  Exhibits C and D.  There are no pending cases at the Board against either Dr. Jefferson or SAPA.

4.　　Given the foregoing, the Board believes that Dr. Jefferson's cross-appeal is moot.  *See Bexar Metro. Water Dist. v. City of Bulverde*, 234 S.W.3d 126, 131 (Tex. App.—Austin 2007, no pet.) ("A case becomes moot when: (1) it appears that one seeks to obtain a judgment on some controversy, when in reality none exists; or (2) when one seeks a judgment on some matter which, when rendered for any reason, cannot have any practical legal effect on a then-existing controversy.").  *See also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (case moot if controversy ceases to exist on appeal); *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) (controversy must exist between the parties at every stage of the legal proceeding, including the appeal; if controversy ceases to exist, case becomes moot).

Should this Court determine that Dr. Jefferson's cross-appeal is moot, the Board submits that dismissal of her cross-appeal would be appropriate, with all parties to bear their own costs and attorney's fees.

Dated: November 5, 2015.

3

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

DAVID A. TALBOT, JR.
Division Chief, Administrative Law Division

*/s/ Ted A. Ross*
Ted A. Ross
Assistant Attorney General
State Bar No. 24008890
OFFICE OF THE TEXAS ATTORNEY GENERAL
ADMINISTRATIVE LAW DIVISION
P. O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-4191
Facsimile: (512) 457-4674
Email: ted.ross@texasattorneygeneral.gov
*Attorneys for Appellants/Cross-Appellees Texas State Board of Veterinary Medical Examiners, and Nicole Oria*

**CERTIFICATE OF SERVICE**

I hereby certify that, in compliance with Rule 9.5 of the Texas Rules of Appellate Procedure, a true and correct copy of the above and foregoing document has been served on the following on this the **5th day of November 2015:**

David F. Brown                                    *Via: **Electronic Service and e-mail***
dbrown@ebblaw.com
David P. Blanke
dblanke@ebblaw.com
Zeke DeRose III
zderose@ebblaw.com
111 Congress Avenue, 28th Floor
Austin, Texas 78701

Ryan Clinton
rdclinton@dgclaw.com
Davis, Gerald & Cremer, P.C.
111 Congress Avenue, Suite 1660
Austin, Texas  78701
*Attorneys for Ellen Jefferson, D.V.M.*

*/s/ Ted A. Ross*
Ted A. Ross
Assistant Attorney General

EXHIBIT A

| | | |
|---|---|---|
| TEXAS BOARD OF VETERINARY | § | BEFORE THE STATE OFFICE |
| MEDICAL EXAMINERS | § | |
| | § | OF |
| v. | § | |
| | § | |
| ELLEN JEFFERSON, D.V.M. | § | ADMINISTRATIVE HEARINGS |

## ORDER NO. 9
## RULING ON EXEMPTION QUESTION AND
## REQUIRING THE PARTIES TO CONFER

### I. PROCEDURAL HISTORY

This is an enforcement case brought by the staff (Staff) of the Texas Board of Veterinary Medical Examiners (Board) against Ellen Jefferson, D.V.M. (Dr. Jefferson or Respondent). Dr. Jefferson, a licensed veterinarian, is a board member and the executive director of San Antonio Pets Alive! (SAPA), a nonprofit animal rescue organization. Staff alleges that Dr. Jefferson, in her work connected with SAPA, violated: the Veterinary Licensing Act (VLA);[1] the Board's rules at title 22, chapter 573 of the Texas Administrative Code; and the Texas Dangerous Drug Act (DDA).[2] Claiming a statutory exemption from the Board's authority, Dr. Jefferson filed a Plea to the Jurisdiction Or, in the Alternative, Motion for Summary Disposition.

On December 9, 2014, the undersigned Administrative Law Judge (ALJ) convened an evidentiary hearing solely concerning the threshold question of whether the alleged acts and omissions of Dr. Jefferson were exempt from enforcement by the Board.[3] This order determines that Dr. Jefferson's conduct was exempt from the Board's enforcement with respect to most, but not all, of the allegations in this case.

---

[1] Tex. Occ. Code ch. 801.

[2] Tex. Health & Safety Code ch. 483.

[3] Both parties filed final briefs on the exemption issue on January 16, 2015.

Although the ALJ is persuaded, in large part, by Respondent's exemption argument, the ALJ does not believe that either dismissal for want of jurisdiction or summary disposition is the appropriate procedural approach.[4] Instead, the ALJ is issuing this order explaining why Dr. Jefferson's actions were exempt from discipline under the VLA with respect to many of the allegations in Staff's pleading. As to those allegations, no further fact finding is necessary. As to the remaining portion of the case, to which the exemption does not apply, adjudication—involving further presentation of evidence—is required. Accordingly, the ALJ will convene the remainder of the hearing and then issue a proposal for decision that incorporates the findings and analysis addressed in this order related to the exemption issue, as well as the issues that have yet to be heard. At the end of this order are instructions to the parties concerning setting a hearing date.

## II. SAPA

The City of San Antonio transfers stray and abandoned dogs and cats to SAPA's ownership after the city has become the owner of the animals by operation of law and the animals are designated for euthanasia. SAPA then becomes the owner of the animals, caring for them (in SAPA shelter facilities or through temporary, volunteer foster families) until the animals' placement with permanent adoptive families.[5] Dr. Jefferson is the lead veterinarian at SAPA.

At the time of the events at issue in this case, SAPA had two contract veterinarians working part-time, as well as three veterinary technicians.[6] Dr. Jefferson was on-call twenty-

---

[4] Summary disposition is not appropriate because the question of the application of the exemption involves disputed facts, which is why an evidentiary hearing on the exemption question was required. *See* 1 Tex. Admin. Code § 155.505(a) ("Summary disposition shall be granted on all or part of a contested case if the pleadings, the motion for summary disposition, and the summary disposition evidence show that there is no genuine issue as to any material fact . . . ."). Dismissal is not the preferred option because it deprives the Board of the opportunity to consider the legal issues involved in the exemption analysis.

[5] Pet. Exs. 7, 21; Resp. Exs. 5-6, 70. The City of San Antonio has stated that the animals SAPA rescues from the City's shelter "are permanent transfers to SAPA and its leader, Ellen Jefferson, D.V.M." Pet. Ex. 7 at 2.

[6] Pet. Ex. 21 at 2.

four hours per day, seven days per week.[7]  To address the veterinary needs of the SAPA rescue animals, SAPA used a triage system, described by Dr. Jefferson as follows:

> All animals are picked up from our clinic before going to foster.  They are evaluated by clinic staff before they are sent to foster homes and any illnesses or conditions that may warrant medical treatment are brought to the attention of a veterinarian, either as soon as the condition is noted or the next time a veterinarian is present.  Alternatively, clinic staff has the additional option of contacting me directly regarding the condition of any animal. The City shelter veterinarians will often help triage more complicated cases if the SAPA! vet is not there, as we share the same compound.
>
> For animals in foster, we have foster liaisons who answer emails as volunteers at fostermedical@sanantoniopetsalive.org.  Although these volunteers are not veterinarians or veterinary technicians, they possess some knowledge in veterinary practice.  These volunteers answer emails from fosters around the clock, use their own phones for emergency calls, and text or call me with every case on which they are contacted.  We treat over 5,500 animals per year and, because of our limited resources, this "triage" communication system that exists between me and our volunteers is also necessary and critical to handle the volume of questions and concerns that we receive from fosters.  This triage system historically has worked well and without incident.  In this regard, I have instituted protocols for care of routine illnesses that are common in a shelter environment, to guide our volunteers and staff in their communications with fosters and in their communications with me.[8]

Dr. Jefferson acknowledges that, under this triage system, she diagnosed and ordered treatment for animals she did not personally examine.

### III. THE STATUTORY CONTEXT OF THIS CASE

The VLA is the Board's organic act and is the source of the Board's authority to regulate veterinarians and the practice of veterinary medicine.  VLA § 801.251 states, "Except as provided by Section 801.004, a person may not practice, or offer or attempt to practice,

---

[7] Pet. Ex. 21 at 2.

[8] Pet. Ex. 21 at 2-3.

veterinary medicine unless the person holds a license to practice veterinary medicine issued under this chapter."[9]

The VLA authorizes the Board to discipline a veterinary licensee for any of a number of specified reasons, which include, among other conduct, engaging in illegal practices connected with the practice of veterinary medicine[10] and violating one of the Board's rules of professional conduct at title 22, chapter 573 of the Texas Administrative Code.[11] As discussed in more detail below, Staff asserts that the Board may discipline Dr. Jefferson for violating a number of Board rules, violating provisions of the DDA related to the handling of dangerous medications, and committing other acts or omissions specified under the VLA as bases for sanction.

The Board's disciplinary authority, however, is subject to a number of exemptions set out in § 801.004 of the statute. One of those exemptions is at issue here. Dr. Jefferson contends that her conduct at issue in this case falls under the following provision, informally known at the "owner exemption":

> This chapter does not apply to:
>
>> (1) the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, unless the ownership, employment, or designation is established with the intent to violate this chapter[.]

This language provides an exemption from the entire VLA. Therefore, the Board has no authority to sanction a veterinarian for the described conduct, even if that conduct is an "illegal

---

[9] "Practice of veterinary medicine" is defined under the VLA as including "the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique." Tex. Occ. Code § 801.002(5)(A).

[10] Tex. Occ. Code § 801.402(4). *See also* 22 Tex. Admin. Code § 573.4 ("No licensee shall commit any act that is in violation of the laws of the State of Texas, other states, or of the United States, if the act is connected with the licensee's professional practice . . . . A complaint, indictment, or conviction of a law violation is not necessary for the enforcement of this rule. Proof of the commission of the act while in the practice of, or under the guise of the practice of, either veterinary medicine or equine dentistry, is sufficient for action by the Board under this rule.")

[11] Tex. Occ. Code § 801.402(6).

practice" in violation of some other law (unless the other law gives the Board that authority, and no such extra-VLA authority is cited by Staff in this case). To the extent the evidence shows that Dr. Jefferson's alleged acts or omissions come within the owner exemption, she must prevail as a matter of law. Dr. Jefferson argues that her SAPA work fell under the exemption because she acted on behalf of the owner, was the designated caretaker of the owner, and was an employee of the owner.

The DDA requirements that Staff alleges were violated by Dr. Jefferson are in subchapter C of chapter 483 of the Texas Health and Safety Code, which is criminal in nature.[12] If Dr. Jefferson is exempt from Board action for any acts alleged to have violated the DDA, she would remain subject to possible criminal prosecution for any mishandling of prescription medications.[13]

## IV. VIOLATIONS ALLEGED BY STAFF

Staff's Second Amended Notice of Hearing, its live pleading in this case, makes the following allegations of violations:[14]

- Dr. Jefferson diagnosed, and prescribed and dispensed medications for, Starlight (a dog) and Cat A218328 without having examined the animals, in violation of VLA § 801.351, and also dispensed prescription medications to SAPA volunteers prior to the identification of any particular animal for treatment, and therefore in the absence of a

---

[12] A person violating the requirements of § 483.042 commits a Class A misdemeanor.

[13] Likewise, if any of Dr. Jefferson's conduct at issue amounted to animal cruelty, she and/or SAPA would be subject to possible criminal prosecution under chapter 42 of the Texas Penal Code (cruelty to nonlivestock animals) or action by local authorities pursuant to municipal ordinances. *See* Resp. Exs. 61-65. SAPA is also subject to the regulatory jurisdiction of the Texas Department of State Health Services pursuant to chapter 823 of the Texas Health and Safety Code (animal shelters). In addition, SAPA's contract with the City of San Antonio requires that the animals be provided with food, water, shelter, and veterinary care, and the City inspects SAPA's facilities. Resp. Exs. 5, 6; Tr. at 58, 62, 64.

[14] Staff's allegations are lengthy. *See* Second Amended Notice of Hearing at 13-18. The ALJ has attempted to distill the material elements into the bulleted list. The two named animals referenced in Staff's allegations, Starlight and Cat A218328, died.

veterinarian-client-patient relationship, in violation of VLA §§ 801.351[15] and 801.402(13);[16]

- Dr. Jefferson dispensed certain prescription medications for Starlight (Amoxicillin and Tramadol) and other prescription medications (including Baytril and Clavanox) to SAPA volunteers for other animals without proper labeling, in violation of DDA § 483.042;[17]

- Dr. Jefferson failed to follow the proper standard of care, and engaged in a pattern of acts indicating consistent malpractice, negligence, or incompetence, in treating Starlight, Cat A218328, and other animals by diagnosing and treating them without examining them, in violation of VLA 801.402(16)[18] and Board Rule 573.22;[19]

- Dr. Jefferson dispensed prescription medications (Amoxicillin, Tramadol, and Baytril) without proper labeling, in violation of Board Rule 573.40;[20]

- Dr. Jefferson failed to establish a veterinarian-client-patient prior to prescribing, dispensing, delivering, or ordering delivered prescription drugs for Starlight (Amoxicillin and Tramadol) and for other animals (Baytril and Clavamox) and by prescribing, dispensing, delivering, or ordering delivered prescription drugs that were not necessary or

---

[15] Section 801.351 states that a person may not practice veterinary medicine unless a veterinarian-client-patient relationship exists. It further states that such a relationship requires, in part, that the veterinarian possesses sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition. A veterinarian possesses sufficient knowledge of the animal if the veterinarian has recently seen, or is personally acquainted with, the keeping and care of the animal by examining the animal; or making medically appropriate and timely visits to the premises on which the animal is kept. The statute also specifies that a veterinarian-client-patient relationship may not be established solely by telephone or electronic means.

Staff also cites to VLA § 801.353, but this section concerns the confidential relationship between the veterinarian and the veterinarian's client, and the ALJ sees no factual allegations related to this subject matter in Staff's Second Amended Notice of Hearing.

[16] Section 801.402(13) provides that a veterinarian is subject to sanction for ordering a prescription drug or controlled substance for the treatment of an animal without first establishing a veterinarian-client-patient relationship.

[17] DDA § 483.042 establishes the circumstances under which dangerous (prescription, non-controlled) drugs may be properly delivered, including labeling requirements. Failure to comply is a criminal offense.

[18] VLA § 801.402(16) provides that a veterinarian is subject to sanction for committing a pattern of acts that indicate consistent malpractice, negligence, or incompetence in the practice of veterinary medicine.

[19] 22 Tex. Admin. Code § 573.22 ("[Veterinary] [l]icensees shall exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession in good standing in the locality or community in which they practice, or in similar communities.")

[20] 22 Tex. Admin. Code § 573.40 (requiring particular information on the labels of all medications dispensed by a veterinarian).

required for the medical care of Starlight (Amoxicillin), in violation of Board Rule 573.41;[21]

- Dr. Jefferson failed to keep proper records for Starlight, Cat A218328, and other patients, in violation of Board Rule 573.52;[22] and

- Dr. Jefferson informed the Board that she could not comply with its request for certain information (contact information for several persons) because she did not have it, but she later produced the responsive information, in violation of Board Rule 573.75.[23]

All allegations except for the last one (the one related to compliance with a Board investigation, which dates from 2013) concern events in 2012.

## V. EXEMPTION ANALYSIS

### A.      Dr. Jefferson Has the Burden to Prove Her Acts Were Exempt from the VLA

In an enforcement case such as this, where a regulatory agency seeks to take disciplinary action against a licensee based on alleged violations of the laws governing such licensees, the agency has the burden of proving its allegations by a preponderance of the evidence. However, the licensee in this case seeks to invoke a statutory exemption to the regulatory scheme. The ALJ determines that the burden of proving the applicability of the exemption is on Dr. Jefferson.

SOAH's procedural rules provide that, in determining who bears the burden of proof, the ALJ shall consider the applicable statute, the referring agency's rules, and the referring agency's

---

[21] 22 Tex. Admin. Code § 573.41(establishing that it is unprofessional conduct for a veterinarian to prescribe, administer, dispense, deliver, or order delivered any prescription drug without first having established a veterinarian/client/patient relationship and determined that such prescription drug is therapeutically indicated for the health and/or well-being of the animal(s)). Staff also contends that the unnecessary prescription of Amoxicillin for Starlight violated VLA § 801.402(12) (providing that a veterinarian is subject to sanction for prescribing unnecessary treatment).

[22] 22 Tex. Admin. Code § 573.52 (setting out requirements for veterinarian patient recordkeeping).

[23] 22 Tex. Admin. Code § 573.75 (providing that a veterinary licensee shall "cooperate fully with any Board inspection or investigation").

policy.[24] The VLA and the Board's rules and policies are silent about the burden of proof as to statutory exemptions. SOAH's rules further provide that, after considering those sources, the judge may consider additional factors. Among those factors are the parties' relative access to and control over information pertinent to the merits of the case and whether a party would be required to prove a negative. The applicability of the exemption at issue relates to Dr. Jefferson's status vis-à-vis SAPA and the animals it rescues—matters about which Dr. Jefferson, and not the Board, has pertinent information. It makes more sense to require Dr. Jefferson to prove that her acts fell within the exemption than it does to require Staff to negate the applicability of the exemption, i.e., to prove a negative. Moreover, claiming an exemption is like raising an affirmative defense, the burden of which to plead and prove is usually on the party urging the defense. For these reasons, the ALJ places the burden of proof on Dr. Jefferson with respect to the exemption issue. And, as there is no reason to deviate from the usual standard of proof applicable in administrative hearings, the ALJ determines that Dr. Jefferson must prove the applicability of the exemption by a preponderance of the evidence.

## B.  Evidence

Dr. Jefferson presented the testimony of the following witnesses:

- Kathy Davis, San Antonio's Director of Animal Care Services;

- Tom Albright, a former board member of Austin Pets Alive! (APA) and a founder and present board member of SAPA; and

- Dr. Jefferson.

Both parties offered documentary evidence, including SAPA corporate and financial materials.

---

[24] 1 Tex. Admin. Code § 155.427.

## C.    The Reason for the Owner Exemption

Dr. Jefferson argues persuasively that the primary concern of the VLA is the protection of animal owners who seek competent veterinary care for their animals. This argument is borne out by the Board's mission statement: "The mission of the Texas State Board of Veterinary Medical Examiners is to establish and enforce policies to ensure the best possible quality of veterinary services for the *people* of Texas."[25] Likewise, the Board's goals are to "ensure that *Texans* are effectively and efficiently served by quality veterinary professionals by setting clear standards for professional conduct, by assuring compliance with the rules of professional conduct and the community standard of care, and seeking solutions to issues that strengthen the profession and *protect the public*."[26] The owner exemption is understandable in light of the people-oriented nature of the VLA and the Board; client-owners who do not hire outside veterinary care need no protection and may treat their animals as they choose, subject to animal cruelty prohibitions.

## D.    SAPA, as Owner of the Animals, Cared For and Treated Them Through Dr. Jefferson

It is undisputed that SAPA owns the animals it rescues and owned the animals referenced in Staff's Second Amended Notice of Hearing.[27] SAPA is a nonprofit corporation.[28]

In 2012, Dr. Jefferson, who was already the executive director of APA, founded SAPA (along with Mr. Albright).[29] During 2012, there were three board members, one of whom was Dr. Jefferson. Dr. Jefferson was (and continues to be) the executive director of the organization. In 2012, she was also the only executive staff, and she was in charge of the paid staff members.[30]

---

[25] Resp. Ex. 20 at 665 (emphasis added).

[26] Resp. Ex. 20 at 665 (emphasis added).

[27] Resp. Ex. 70.

[28] Pet. Exs. 13, 14.

[29] Resp. Ex. 2; Resp. Ex. 71 at 8-9.

[30] Tr. at 198.

She authored the care and treatment protocols used by SAPA staff and volunteers.[31] She was the designated representative and signatory of SAPA's tax documents.[32] She was the signatory for the lease of its shelter space.[33]

SAPA's care and treatment of animals it owned were exempt from the VLA. SAPA's mission is to take animals on the euthanasia list maintained by San Antonio Animal Care Services and place them in adoptive homes.[34] This process necessarily involves the care and treatment of the animals. As a nonprofit corporation, SAPA can only effect the treatment and care of its animals through the humans who comprise the corporation. And the acts of a corporate agent on behalf of his or her principal are ordinarily deemed to be the corporation's acts.[35] In 2012, Dr. Jefferson, as founder, executive director, board member, and author of the organization's care and treatment protocols, was more directly associated with the organization than any other person. In her mission-critical functions, her actions were the actions of SAPA. Dr. Jefferson's alleged VLA violations all occurred in the context of SAPA's care of the animals. The ALJ can see no legal or logical reason for concluding that Dr. Jefferson's care and treatment of the animals was somehow distinct from SAPA's care and treatment of the animals. They were one and the same.

Further militating in favor of this interpretation of the exemption is the fact that, in the context of SAPA's work, the VLA's requirement of a veterinarian-client-patient relationship makes no sense. The veterinarian, Dr. Jefferson, founded, directs, operates, and carries out the mission of SAPA. There is no separate client who has hired a veterinarian in an arm's-length transaction and whose interests must be protected by the Board through the VLA. If Dr. Jefferson were regarded as distinct from SAPA for purposes of this analysis, a valid veterinarian-client-patient relationship would require that, as to each animal, the client, which

---

[31] Tr. at 58-9, 199.

[32] Pet. Exs. 13, 15; Resp. Ex. 4.

[33] Resp. Ex. 8.

[34] Resp. Ex. 21 at 1.

[35] *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003).

would likely be SAPA's sole executive staffer (Dr. Jefferson) or possibly the SAPA board of directors (Dr. Jefferson and two others) would agree to follow the instructions of the veterinarian (Dr. Jefferson).[36] The application of this idea to the context of this case is nonsensical because there is only SAPA, caring for its own animals though its chief agent, Dr. Jefferson.

Finally, Staff's argument that Dr. Jefferson's conduct is not subject to the owner exemption because § 801.004(1) does not specify "owner's agent" is not persuasive. First, there was no need because, as discussed above, the law recognizes that a corporation can only act through humans. Second, the term "designated caretaker" (discussed below) is synonymous in this context with "agent," for what is a designated caretaker of animals but an agent for the care and treatment of animals?

## E.     Dr. Jefferson Was a Designated Caretaker of SAPA's Animals

As noted above, VLA § 801.004(1) also exempts the care and treatment of animals, not just by the owner, but by "a designated caretaker." This term is not defined, and the statute establishes no process for the designation of a caretaker. Staff argues that the phrase cannot refer to Dr. Jefferson because, if it did, it would extend to all veterinarians caring for animals in any capacity other than as direct employees of owners. Part of the difficulty with Staff's argument is that it only asserts Dr. Jefferson was not a designated caretaker of SAPA's animals, and it fails to advance a theory about what the phrase was intended to encompass.

The only logical interpretation for "designated caretaker" is that it means an agent of the owner selected to provide care or treatment of the owner's animal. An agent in this context would not include a veterinarian hired by an owner as an independent contractor in an arm's length transaction. Staff correctly points out that including such fee-for-service veterinarians in the meaning of "designated caretaker" would swallow most of the Board's regulatory authority; that result cannot have been intended by the Legislature. But Dr. Jefferson's care and treatment

---

[36] Tex. Health & Safety Code § 801.351 ("A veterinarian-client-patient relationship exists if the veterinarian: (1) assumes responsibility for medical judgments regarding the health of an animal and a client, who is the owner or other caretaker of the animal, agrees to follow the veterinarian's instructions . . . .")

of SAPA's animals was not as a fee-for-service independent contractor, but rather was an integral part of the inner workings of SAPA. It therefore makes sense to include Dr. Jefferson's SAPA work as falling within the owner exemption. That other individuals (such as SAPA volunteers and fosters actively involved in the care of the animals[37]) might, arguably, also have been caretakers for SAPA's animals does not mean that Dr. Jefferson's actions did not come within the exemption. The statute refers to "*a* designated caretaker,"[38] not "*the* designated caretaker," implying that there could be more than one such caretaker for an animal.[39] Finally, Staff's suggestion that a caretaker designation must occur through a written document is unsupported by any statutory language.[40]

## F.      Dr. Jefferson's Employee Status Was Not Established

Dr. Jefferson asserts that she was SAPA's employee. "Employee" is not defined in this context, but Staff persuasively argues that the ordinary meaning of the word is a person working for someone else for pay.[41] Dr. Jefferson has not established by a preponderance of the evidence that SAPA paid her for her work.

The evidence about Dr. Jefferson's remuneration is conflicting. On the one hand, she testified that, during the time at issue, she was paid for her work as the SAPA executive director by APA at SAPA's request because APA (the older and more established institution) had the administrative machinery to handle the funds.[42] The record includes an undated, handwritten document, signed by Dr. Jefferson and Mr. Albright for SAPA and by a representative of APA,

---

[37] The ALJ is not suggesting that, in the words of Staff, "any person who helps out at SAPA" is exempt from the Act. Petitioner's Closing Brief at 9-10. Rather, the exemption might extend to any person at SAPA who acts as part of the organization's system of triage and animal care.

[38] Emphasis added.

[39] In 2014, SAPA's Board issued a formal, ostensibly retroactive designation of Dr. Jefferson as a caretaker of SAPA's animals, apparently to settle the question of the organization's intent. Resp. Ex. 43. Because the document was issued well after the events at issue in this case, the ALJ gives it little weight.

[40] Staff also argues that Dr. Jefferson did not care for the animals at issue and therefore could not have been their caretaker. But this argument contradicts Staff's contention that Dr. Jefferson treated the animals.

[41] *See* Pet. Ex. 12.

[42] Tr. at 98-99, 144.

stating that SAPA agreed to pay $200,000 to APA for various kinds of administrative support in 2012.[43] Although the agreement reflects a "start date" of January 1, 2012, Mr. Albright testified that the agreement was actually signed in September 2012.[44] The agreement makes no mention of Dr. Jefferson's salary. Dr. Jefferson testified that a $35,000 portion of the $200,000 from SAPA to APA was for her work as the SAPA executive director and that APA then paid that $35,000 to her.[45] Mr. Albright also implied that a portion of the $200,000 went toward Dr. Jefferson's salary.[46] The record further includes an undated invoice from APA to SAPA for a total of $200,000, with $35,000 designated for Executive Director services.[47]

However, there is no corresponding check or other evidence of payment of the $200,000 from SAPA to APA. Nor is there any check or W-2 form reflecting payment to Dr. Jefferson of a salary from SAPA; she testified that the amounts for her SAPA work were included in her W-2 form from APA.[48] Further, SAPA's tax return for 2012 states that SAPA paid no compensation to Dr. Jefferson.[49] Dr. Jefferson testified that this was a mistake.[50]

The evidence on the question of whether Dr. Jefferson was a paid employee of SAPA in 2012 is too contradictory for the ALJ to find that Dr. Jefferson has met her burden of proof on this issue.

---

[43] Resp. Ex. 54 (front).

[44] Resp. Ex. 71 at 40-42.

[45] Tr. at 98.

[46] Resp. Ex. 71 at 8-11.

[47] Resp. Ex. 54 (back). It is unclear whether the two (front and back) pages of Respondent's Exhibit 54 were created as parts of the same document.

[48] Tr. at 199-200.

[49] Pet. Ex. 13.

[50] Tr. at 99-100.

G.     **Ownership or Caretaker Status Was Not Established With Intent to Circumvent VLA**

Staff argues that SAPA's ownership of the dogs and cats at issue, and Dr. Jefferson's agency and caretaker status (if they exist), were established with intent to circumvent the VLA, and the exemption therefore does not apply.[51]  Staff suggests that SAPA's triage system is a scheme to circumvent the VLA.

The evidence establishes that the purpose of SAPA's ownership of the animals is to prevent their being euthanized, and the purpose of Dr. Jefferson's designation as a caretaker of the animals is to afford them, through SAPA's triage system, the level of veterinary care SAPA can afford.  The owner exemption gives SAPA the freedom to determine what level of veterinary care it will provide to its own animals (subject to state animal cruelty prohibitions, chapter 823 of the Texas Health and Safety Code, municipal ordinances, and SAPA's contractual obligations to the City of San Antonio).  Staff's apparently circular argument that anyone operating under the owner exemption is trying to circumvent the VLA would eliminate the exemption.  SAPA and Dr. Jefferson took custody of the animals and provided them with care in order to prevent euthanasia, and the fact that SAPA seeks to take advantage of the owner exemption does not change their goal.

Making Staff's position on the circumvention question even more puzzling is a newsletter issued by the Board's Executive Director in 2012 actually stating that animal shelters, once they own the animals in their care, can rely on the owner exemption.  The Fall 2012 *Board Notes* states that, after an animal shelter takes ownership, the owner exemption applies:

> After the time period for holding the animal has elapsed, usually three days and set by local ordinance, then the shelter may claim the animal is abandoned and the shelter is the owner. Under Texas law, an animal's owner or a caretaker designated by the owner can perform acts of veterinary medicine on the animal

---

[51]  Again, the exemption covers "the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, *unless the ownership, employment, or designation is established with the intent to violate this chapter*[.]"  Tex. Occ. Code § 801.004(1) (emphasis added).

without involving a veterinarian and without concern for establishing a
veterinarian-client-patient relationship, because the owners and caretakers are
exempt from the Veterinary Licensing Act.[52]

This statement, made roughly contemporaneously with the events at issue in this case,
jibes with Dr. Jefferson's view of the owner exemption and its applicability to shelters.
Dr. Jefferson testified that this statement, which she read when it was issued, confirmed her
understanding that SAPA's procedures complied with the VLA.[53]

### H.    "Care or Treatment of an Animal"—Alleged Failure to Cooperate with Board Investigation and DDA Violations Not Exempt

In order for the owner exemption to apply, the conduct at issue must have constituted
"the treatment or care of an animal."[54]  One of Staff's allegations is completely unrelated to
Dr. Jefferson's treatment of care of an animal:  the allegation that Dr. Jefferson failed to
cooperate fully with a Board investigation.  There is no question that the owner exemption does
not apply to this assertion.

Further, a Travis County District Court, in litigation related to this contested case hearing
process, determined that the owner exemption does not prohibit the Board from taking
enforcement action against Dr. Jefferson based on alleged violations of the DDA in connection
with her handling and/or labeling of prescription medications.[55]  In making this determination,
the Court must have concluded that any alleged failure to handle medications in compliance with
the DDA is distinct from the "treatment or care of an animal"; otherwise, the actions would be
exempt from the Board's enforcement (provided that the other elements of the exemption are
present).  Accordingly, litigation of these allegations is necessary.

---

[52] Resp. Ex. 18.

[53] Tr. at 114-16.

[54] Tex. Occ. Code § 801.004(1).

[55] Pet. Ex. 25.

The remainder of the allegations in this case concern conduct by Dr. Jefferson in the context of SAPA's treatment and care of its animals.

## I.    Summary

All of Staff's allegations in this case relate to alleged conduct by Dr. Jefferson that is exempt from the VLA under § 801.004(1), the owner exemption, except for the following allegations that:

- Dr. Jefferson dispensed prescription medications for Starlight (Amoxicillin and Tramadol) and other prescription medications (including Baytril and Clavanox) to SAPA volunteers for other animals without proper labeling, in violation of DDA § 483.042;[56] and

- Dr. Jefferson informed the Board that she could not comply with its request for certain information (contact information for several persons) because she did not have it, but she later produced the responsive information, in violation of Board Rule 573.75.[57]

## VI.  REQUIRING THE PARTIES TO CONFER

The parties shall confer and, *no later than March 11, 2015*, submit to the ALJ at least two agreed dates for the resumption of the hearing on the merits.

**SIGNED February 25, 2015.**

SHANNON KILGORE
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

[56] DDA § 483.042 establishes the circumstances under which dangerous (prescription, non-controlled) drugs may be properly delivered, including labeling requirements.

[57] 22 Tex. Admin. Code § 573.75 (providing that a veterinary licensee shall "cooperate fully with any Board inspection or investigation").



EXHIBIT B

| | | |
|---|---|---|
| TEXAS BOARD OF VETERINARY | § | BEFORE THE STATE OFFICE |
| MEDICAL EXAMINERS | § | |
| | § | OF |
| v. | § | |
| | § | |
| ELLEN JEFFERSON, D.V.M. | § | ADMINISTRATIVE HEARINGS |

## ORDER NO. 14
## REFERRING CASE FOR MEDIATION EVALUATION

The hearing on the merits is set to resume on August 12-13, 2015. It a recent motion, the staff of the Texas Board of Veterinary Medical Examiners indicated that the parties will attempt to seek a mutually agreed outcome to this contested case. In light of the parties' plan to explore settlement, the Administrative Law Judge (ALJ) is referring this matter to the Alternative Dispute Resolution Team of the State Office of Administrative Hearings (SOAH) for a **mediation evaluation.** No party to this case is compelled to participate in mediation. Pursuant to this referral, a SOAH mediator will contact the parties, assess the case to determine whether mediation would be helpful, and ascertain if the parties are interested in pursuing mediation. If a party declines to participate in mediation or the mediator determines that mediation would not be appropriate or helpful, the case will be returned to the undersigned ALJ. **This order does not affect the hearing setting.**

**IT IS, THEREFORE, ORDERED:**

1. This case is referred to SOAH's Alternative Dispute Resolution Team Leader, Howard S. Seitzman, for appointment of a mediator and a period of evaluation and/or mediation. With the issuance of this Order, the official file in this case is transferred to Judge Seitzman. The mediator/evaluator will be contacting the parties directly.

2. If the mediator/evaluator determines that mediation is appropriate, the mediator will schedule a mediation in consultation with the parties.

3.      If the mediator /evaluator schedules a mediation, the parties are ordered to appear at the mediation with a party representative (in addition to the attorney) who has full settlement authority for this matter.

4.      The case shall be returned to the presiding ALJ **by August 7, 2015,** unless the deadline is extended by order of the presiding ALJ.

**SIGNED June 17, 2015.**

SHANNON KILGORE
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

EXHIBIT C

## SOAH DOCKET NO. 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

| | | |
|---|---|---|
| TEXAS BOARD OF VETERINARY | § | BEFORE THE STATE OFFICE |
| MEDICAL EXAMINERS | § | |
| | § | OF |
| v. | § | |
| | § | |
| ELLEN JEFFERSON, D.V.M. | § | ADMINISTRATIVE HEARINGS |

### ORDER NO. 16
### DISMISSING CASE

There is no pending hearing setting in this case, which was previously referred for mediation. The mediators have reported that the dispute has been resolved. Further, the staff of the Texas State Board of Veterinary Medical Examiners has filed a motion to dismiss this case with prejudice from the docket of the State Office of Administrative Hearings. The motion is **granted**.

**SIGNED October 20, 2015.**

SHANNON KILGORE
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS


EXHIBIT D



# TEXAS BOARD OF
# VETERINARY MEDICAL EXAMINERS

October 20, 2015

David F Brown
111 Congress Ave 28th Floor
Austin TX 78701

Re:     Case No: 578CP14000520
        Ellen Jefferson, DVM

Dear Dr Jefferson:

This letter is to inform you that case 578CP14000520 has been closed due to insufficient evidence.

After review of all documentation and statements, it was determined that there is insufficient evidence to prove a violation of the Veterinary Licensing Act or the Rules of Professional Conduct.

This case will be closed and no further action will be taken. Please do not hesitate to contact me with any questions.

Sincerely,

Karen Phillips
Director of Enforcement

KP/pg

RECEIVED

OCT 2 6 2015

OFFICE OF THE ATTORNEY GENERAL
ADMINISTRATIVE LAW DIVISION

333 GUADALUPE, SUITE 3-810-AUSTIN, TEXAS 78701-3942
TELEPHONE: (512) 305-7555   Email: vet.board@tbvme.state.tx.us
Main FAX: (512) 305-7556    Enforcement FAX: (512) 936-0837    Legal FAX: (512) 305-7574

# TEXAS BOARD OF
# VETERINARY MEDICAL EXAMINERS

October 20, 2015

David F Brown
111 Congress Ave 28th Floor
Austin TX 78701

Re:    Case No: 578CP14000523
       Ellen Jefferson, DVM

Dear Dr Jefferson:

This letter is to inform you that case 578CP14000523 has been closed due to insufficient evidence.

After review of all documentation and statements, it was determined that there is insufficient evidence to prove a violation of the Veterinary Licensing Act or the Rules of Professional Conduct.

This case will be closed and no further action will be taken. Please do not hesitate to contact me with any questions.

Sincerely,

Karen Phillips
Director of Enforcement

KP/pg